A03A2139. ZHOU v. LaGRANGE ACADEMY INCORPORATED.
(597 SE2d 522)

MIKELL, Judge.

After a bench trial, the trial court entered judgment in favor of LaGrange Academy Incorporated (the "Academy") in this breach of employment contract action. Dr. Wei-Kang Zhou, pro se, appeals, and we affirm.

The evidence adduced at trial showed that Dr. Zhou and the Academy entered into a written employment contract on July 24, 1995. Dr. Zhou was hired as the Academy's orchestra director for the 1995-1996 academic year. The contract provided an annual salary of $30,000 to be paid over 12 months and outlined Dr. Zhou's duties and the Academy's expectations, including, but not limited to the following:

> [d]isagreement and debate, within the confines of respect and dignity, are acceptable. . . . The teacher is expected to work

cooperatively with every member of the school faculty and staff and to participate effectively in the establishment and maintenance of effective school programs and curriculum, an atmosphere of collegial support, and adherence to professional standards. The teacher's willingness to be "a part of the team" should be obvious and evident in both actions and participation and in a supportive attitude toward colleagues and the programs with which they work, the administration and the school as a whole. . . . The teacher is expected to be open to constructive guidance and evaluation of professional performance as it relates to the effectiveness of teaching within the classroom, efforts to develop and maintain positive relationships within the school, and the appropriateness of attitudes as perceived by the entire school community and as evaluated by the administration.

Also included was a provision permitting the Academy to terminate the contract upon a "teacher's non-performance of duty, incompetency, immorality, ineffectiveness, inefficiency." Should such a termination occur, the Academy was required to provide a written statement of charges on which the dismissal was based.

This dispute arose because the Academy provided written notice to Dr. Zhou that his contract was being terminated, effective September 25, 1995, due to ineffectiveness. The termination letter stated that Dr. Zhou failed to comply with the requirements quoted above and that he demonstrated an "inability or unwillingness to 'support the fine arts program of the Academy' as indicated in the advertised position description." The events that allegedly resulted in Dr. Zhou's termination are as follows.

Martha Ann Todd, the Academy's Head of School, testified that when she spoke with Dr. Zhou on the telephone during the interview process, she informed him that he would have his own office in the orchestra house. She also told him that although the orchestra house had been used solely for orchestra in the past, that was not the plan for the upcoming school year. During her initial in-person meeting with Dr. Zhou on August 17, 1995, Deborah Ogle, the fine arts coordinator, was in attendance. Todd explained to Dr. Zhou that Ogle was responsible for coordinating all fine arts events and scheduling the use of the facilities and that while he was expected to help with the scheduling, Ogle had the final authority. Todd recalled that the three of them met again on August 20, 1995, but that sometime thereafter, Dr. Zhou began to complain that the orchestra should have full use of the orchestra house.

On August 24, 1995, Ogle's class was listed on the master schedule to use the orchestra house, but when they arrived, Dr. Zhou

was giving a lesson there instead. As Ogle and her students quietly entered the room to retrieve their music, Dr. Zhou began flailing his arms and yelling at Ogle in front of the students. Upon learning of this incident, Todd met with Dr. Zhou and Ogle. Dr. Zhou became very upset, so Todd told them to return the next day with notes about resolving their disagreement. Ogle testified that after Todd left the room, Dr. Zhou turned his back to her and refused to talk to her, and when she persisted, he yelled, "I have no wish to speak to you," and left the room. Ogle followed him and he yelled in her face, which stunned and scared her, then left the room again. Todd testified that she heard Dr. Zhou scream at Ogle. Ogle gave Todd a memo about the incident later that day, but Dr. Zhou did not. When Todd met with Dr. Zhou on the following day, she told him that his attitude and behavior would not be tolerated and that he needed to have a good working relationship with Ogle, particularly in light of her role as fine arts coordinator.

On another occasion, Todd gave Dr. Zhou a memo inquiring about the number of private students he planned to teach and informing him that Cindy Brown would be available to help him schedule those students, but that scheduling still had to be confirmed with Ogle. Dr. Zhou responded to her request two weeks later and told her that he did not think Brown was qualified and that he would not work with her.

Ogle testified that during the week of September 11, 1995, Dr. Zhou left a very young student unattended after giving the child violin lessons. Ogle and her husband were passing by the school when she noticed the young boy, who was holding a violin case and standing with one foot on a highway. Dr. Zhou was loading his car, and when she asked him if he planned to leave the child, he replied that he did, and left. The child's parents were late, so Ogle and her husband stayed with him until they arrived. Ogle notified Todd of the incident. On September 15, Todd met with Dr. Zhou for almost two hours to discuss that incident and to address his concerns. She met with him again on September 18 in an attempt to resolve some of his issues. At that meeting, she told him, "I've got three things to work with, Dr. Zhou. We've got the scheduling; we've got the facilities; and we've got personnel. And your job is at stake here; you need to realize that."

After that meeting, another incident occurred between Dr. Zhou and Ogle concerning the arrangement of chairs. Dr. Zhou had agreed to mark with tape the chairs he wanted to use for his class, but he never did so. Ogle testified that she and Brown would arrange the chairs as best they could, which was never suitable to Dr. Zhou. On one afternoon, she and Brown stacked the chairs in the back of the room since they knew they were not arranging them properly. Dr. Zhou came in the room, asked what they were doing with the chairs,

became very upset and began to flail his arms, then turned around and exited the building. Ogle recalled that students were present during this incident also.

On September 21, 1995, Dr. Zhou gave Todd a memo addressing what he perceived to be the problems with the orchestra house. He wrote the following: that the orchestra needed exclusive use of the orchestra house; that the choir needed to use the gym; that if Ogle needed a larger space, so did he; that it was unfair that the choir classes were held before the orchestra classes; that his office was too small; and that he could not work there. Todd testified that after reading the memo several times, she was discouraged because she realized that after all of her discussions with Dr. Zhou, he was simply unwilling to work with Ogle, Brown, and with the facilities the Academy had available for his use.

Over the subsequent weekend, Todd contacted the Academy's executive committee members and informed them of the recent events with Dr. Zhou and that she planned to have one last discussion with him on the following Monday. She suggested that if he remained resistant, he should be offered the opportunity to resign or be terminated. When she met with Dr. Zhou that Monday, his attitude remained unchanged. She gave him the opportunity to resign several times, which he refused. Ultimately, Todd informed him that his contract would be terminated. Todd tried to give Dr. Zhou his termination letter on September 25, which outlined the reasons for his termination. Enclosed therewith was a check for the salary he was owed at that time and a $1,000 severance check, but he refused to accept the letter. She mailed the letter to Dr. Zhou via certified mail, return receipt requested.

After his dismissal, Dr. Zhou wrote a letter to Todd demanding an appeal, which was granted. The Academy's counsel replied and in their letter explained to Dr. Zhou the format for the hearing and enclosed the school policy regarding same. During the hearing, it appears that Dr. Zhou claimed that one of the reasons for his termination was his national origin. Dr. Zhou testified that he filed an Equal Employment Opportunity Commission complaint against the Academy.

The Academy offered Dr. Zhou a settlement proposal, then a restructured position with the Academy to teach classes at LaGrange College and a continuation of his salary and benefits under his employment contract. Dr. Zhou rejected both offers, stating that anything less than his former job duties was simply unacceptable. The Academy's board affirmed Todd's decision.

1. We address first the pivotal issue in this case, which is whether the Academy breached Dr. Zhou's employment contract by terminating him for ineffectiveness. We agree with the trial court's conclusion that it did not.

Where an employer and employee enter a written contract for employment, they are bound by the terms included in that agreement.[1] The trial court's construction of that contract is a question of law[2] and receives de novo review on appeal.[3] In this case, Dr. Zhou does not dispute the trial court's construction of the contract. Instead, he disputes the trial court's conclusion that the Academy did not breach the contract and in support thereof argues that certain of the trial court's findings of fact were incorrect and that it omitted several findings which would have been beneficial to him.

> On appellate review of a bench trial, the factual findings shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. In bench trials, the judge sits as trier of fact and the court's findings are analogous to a jury's verdict and should not be disturbed if there is any evidence to support them.[4]

Dr. Zhou argues specifically that the trial court erroneously decided findings of fact 5, 6, 9, 11-15, and 17-19. However, each of the disputed findings is supported by the evidence discussed above.

> We do not, on appeal, blindly accept the evidence of any party to the litigation or determine the merits of the case from a point of advocacy. Rather we follow the rule that where the trial court finds the facts and enters judgment thereon, the sole question for determination is whether there is any evidence to authorize that judgment. It is our duty to construe the evidence to uphold the judgment rather than upsetting it. . . . [Therefore,] [i]n the absence of legal error, an appellate court is without jurisdiction to interfere with the

---

[1] *Nel v. DWP/Bates Technology*, 260 Ga. App. 426, 428 (1) (579 SE2d 842) (2003).

[2] *A & D Asphalt Co. v. Carroll & Carroll of Macon, Inc.*, 238 Ga. App. 829, 832 (3) (520 SE2d 499) (1999).

[3] *Buckmon v. Futch*, 237 Ga. App. 67, 69 (1) (514 SE2d 863) (1999).

[4] (Citations and punctuation omitted.) *Benson v. McMillan*, 261 Ga. App. 78-79 (581 SE2d 707) (2003); *Alonso v. Hosp. Auth. of Henry County*, 175 Ga. App. 198, 199 (2) (332 SE2d 884) (1985).

judgment supported by some evidence.[5]

Therefore, even if the findings of fact argued by Dr. Zhou on appeal would have been authorized by the evidence presented at trial, because the evidence authorized the facts found by the trial judge, we cannot set them aside.[6]

Dr. Zhou was terminated based on his ineffectiveness and unwillingness to support the fine arts program. Pursuant to OCGA § 13-2-2 (2), the trial court was obligated to give "ineffectiveness" its usual, ordinary, and common meaning.[7] Sitting as trier of fact, the trial judge listened to the evidence and concluded based thereon that the Academy's determination that Dr. Zhou was ineffective in fulfilling his contractual duties was supported by that evidence. Because there is evidence to support the trial court's findings, we must uphold its judgment.

In support of his argument that he was not "ineffective," Dr. Zhou offered the testimony of Faye Riddle, who was a member of the Academy's board. She testified that she had never witnessed a termination within the first month of employment except in cases where the dismissed employee committed an illegal or immoral act. Dr. Zhou argues in his brief that because Riddle was an administrative expert witness, the trial judge should have given her testimony more weight. However, Riddle was not qualified as an expert. And "[a]bsent qualification as an expert witness and tender of the witness as an expert, a witness' opinion is that of a layperson."[8] The trier of fact is not required to believe opinion evidence.[9] Even if Riddle had been qualified as an expert, the weight and credibility to be given her opinion testimony remain within the trial court's discretion.[10] Accordingly, the trial court was not required to give Riddle's testimony more weight than the other evidence presented as to the reasons the Academy concluded that Dr. Zhou was ineffective.

Dr. Zhou also argues that the Academy breached the contract because it terminated him less than four weeks after his employment commenced. As stated earlier, the parties are bound by the terms of

---

[5] (Citations and punctuation omitted.) *Mills v. Berlex Laboratories*, 235 Ga. App. 873, 875 (510 SE2d 621) (1999).

[6] *Atlantis Realty Co. v. Morris*, 142 Ga. App. 470, 471 (1) (236 SE2d 163) (1977).

[7] See *Ga. Magnetic Imaging v. Greene County Hosp. Auth.*, 219 Ga. App. 502, 503-504 (1) (466 SE2d 41) (1995).

[8] (Citation omitted.) *CFUS Properties v. Thornton*, 246 Ga. App. 75, 77 (1) (539 SE2d 571) (2000).

[9] *Carver v. Kinnett*, 209 Ga. App. 577, 579 (1) (434 SE2d 136) (1993).

[10] *Hill v. Centennial/Ashton Properties Corp.*, 254 Ga. App. 176, 178 (4) (561 SE2d 853) (2002).

the contract.[11] Under the contract, there was no time limitation imposed on the Academy's right to terminate the contract. The contract provided specific reasons for which an employee could be terminated and that the reasons for the dismissal must be supplied to the employee in writing. The Academy complied with the dictates of the contract.

2. Dr. Zhou contends that the trial court failed to acknowledge the import of the verbal agreements between him and Todd pertaining to the scheduling of orchestra classes. Dr. Zhou maintains that these agreements were made during the job interview process and were written in the cover letter that accompanied the proposed employment contract.

> Where parties have reduced to writing what appears to be a complete and certain agreement, it will, in the absence of fraud, accident, or mistake, be conclusively presumed that the writing contains the entire contract, and parol evidence of prior or contemporaneous representations or statements is inadmissible to add to, take from, or vary the written instrument.[12]

There is no evidence in the record that the cover letter was intended to be a part of the employment contract.

3. The trial court concluded that Dr. Zhou did not present convincing evidence that the Academy acted in bad faith. Dr. Zhou argues that he was terminated without a warning within the first month of his employment and was denied an appeal of Todd's decision to terminate him, all of which constituted bad faith. The record is devoid of evidence to support Dr. Zhou's argument.

Notwithstanding the fact that the contract did not obligate the Academy to warn of an impending termination, the record shows that Todd did warn Dr. Zhou. With regard to when the termination occurred, again, the parties are bound by the terms of the contract,[13] and there was no time limitation imposed on the Academy's right to terminate the contract. Therefore, we reject Dr. Zhou's attempts to impose additional terms in the contract. Lastly, Dr. Zhou was offered the appeal process that was afforded all members of the faculty under the school policy. Accordingly, there was evidence to support the trial court's conclusion that the Academy did not act in bad faith.

4. Dr. Zhou argues that the trial court erred in its order by citing OCGA § 13-6-5 and stating that he had a duty to accept the altered

---

[11] *Nel,* supra.

[12] (Citation and punctuation omitted.) *Heyman v. Financial Properties Developers,* 175 Ga. App. 146, 148 (332 SE2d 893) (1985).

[13] *Nel,* supra.

contract offered by the Academy. The trial court cited OCGA § 13-6-5 in an attempt to explain the general proposition that a plaintiff injured by a breach of contract has a duty to mitigate his damages. The court stated that even if it had found that the Academy breached Dr. Zhou's employment contract, his ability to recover the compensatory damages that he sought would have been affected by his failure to accept the job offered by the Academy, which continued the salary and benefits under his original contract. We find no error.

*Judgment affirmed. Johnson, P. J., and Eldridge, J., concur.*

DECIDED MARCH 23, 2004.

Wei-Kang Zhou, *pro se.*
*William P. Steinhaus,* for appellee.